**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHONDRELL STEPHENSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21 CV 338 |
| | ) | |
| CITY OF CHICAGO and CHICAGO POLICE | ) | |
| OFFICERS WILFREDO ORTIZ, Star #9748, | ) | |
| ADAM ALTENBACH, Star #13832, | ) | |
| DEAN EWING, Star #8653 | ) | Honorable Judge Lindsay C. Jenkins |
| MICHAEL FITZGERALD, Star #1738 and | ) | |
| TYRONE JACKSON, Star#21175, 7587 | ) | Magistrate Judge Jeffrey Gilbert |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT AT LAW

NOW COMES the Plaintiff, SHONDRELL STEPHENSON, by and through counsel,

BRANDON BROWN, THE BROWN LAW LTD., and complaining of the defendants, CITY OF

CHICAGO and CHICAGO POLICE OFFICERS WILFREDO ORTIZ, Star#9748, ADAM

ALTENBACH, Star #13832, DEAN EWING, Star #8653, MICHAEL FITZGERALD, Star

#1738 and TYRONE JACKSON, Star #21175, 7587 states as follows:

### INTRODUCTION

This is a civil action seeking damages against defendants for committing acts under color

of law, and depriving Plaintiff Shondrell Stephenson of his rights secured by the Constitution

and laws of the United States of America.

### JURISDICTION

1. This action is brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983, and the Fourth

   and Fourteenth Amendments to the United States Constitution.

2.      The jurisdiction of this Court is invoked pursuant to the judicial code 28 U.S.C. § 1331 and 1343 (a); the Constitution of the United States; and pendent jurisdiction as provided under U.S.C. § 1367(a).

## PARTIES

3.      PLAINTIFF SHONDRELL STEPHENSON is a citizen of the United States of America, who, at all times relevant, resided in Cook County, Illinois.

4.      DEFENDANTS WILFREDO ORTIZ, Star #9748, ADAM ALTENBACH, Star #13832, DEAN EWING, Star #8653, MICHAEL FITZGERALD, Star #1738 and TYRONE JACKSON, Star #21175, 7587 ("Defendant Officers"), were, at the time of this occurrence, duly licensed Chicago Police Officers. They engaged in the conduct complained of in the course and scope of their employment and under color of law. They are sued in their individual capacities.

5.      DEFENDANT CITY OF CHICAGO ("City") is a municipal corporation duly incorporated under the laws of the State of Illinois, and is the principal employer of the Individually Named Defendant Officers.

## FACTS

6.      On July 4, 2017, at or around 1:25 pm, Plaintiff Shondrell Stephenson was at a "friends and family" cookout celebrating Independence Day at the private residence located at 10019 S. State Street, Chicago, Illinois.

7.      Defendant Officers, without a warrant, reasonable and articulable suspicion or any other lawful basis, entered on and into the backyard and/or otherwise inside of the private property and conducted a seizure of the Plaintiff Shondrell Stephenson.

8.     Defendant Officers heinously disregarded and interrupted a peaceful friendly Independence Day afternoon gathering on July 4, 2017.

9.     Prior to the Defendant Officers interrupting the aforementioned Independence Day gathering, said Defendant Officers had not received any calls for any disturbances or unlawful activity at 10019 S. State Street, Chicago, IL.

10.     Prior to the Defendant Officers interrupting the aforementioned Independence Day gathering, said Defendant Officers had not received any calls or information from dispatch indicating that Shondrell Stephenson or a person matching his description was involved in any criminal or suspicious activity at 10019 S. State Street, Chicago, IL or anywhere else.

11.     Subsequent to the Defendant Officers' unlawful invasion of the private residence, Plaintiff Shondrell Stephenson was arrested by Defendant Officers. Plaintiff's arrest was made without a warrant or probable cause. Immediately before he was arrested by the Defendant Officers, Plaintiff was not violating any laws, rules or ordinances. As the Plaintiff was being arrested, he was not violating any laws, rules, or ordinances.

12.     Prior to Shondrell Stephenson being arrested the Defendant Officers did not observe Shondrell Stephenson committing a crime or doing anything suspicious or criminal.

13.     There was no probable cause or justification for the arrest of Plaintiff Shondrell Stephenson on July 4, 2017.

14.     Despite there being no probable cause or justification for Shondrell Stephenson to be arrested the Defendant Officers fabricated that Shondrell Stephenson was illegally in possession of a firearm on July 4, 2017.

15.     At no point on July 4, 2017 did Shondrell Stephenson ever possess a firearm.

16.     At no point on July 4, 2017 was Shondrell Stephenson ever seen possessing a firearm.

17.      At no point on July 4, 2017 did Shondrell Stephenson ever carry a firearm.

18.     At no point on July 4, 2017 did Shondrell Stephenson ever touch, come close to or lay a hand on a firearm.

19.     After arresting Shondrell Stephenson the Defendant Officers generated false police reports containing a blatantly false narrative against Shondrell Stephenson.

20.     After arresting Shondrell Stephenson Defendant Officer Dean Ewing created false police reports containing a blatantly false narrative against Shondrell Stephenson.

21.     Officer Ewing's actions were consistent with the Officer Ewing's and the City of Chicago's repeated and consistent code of silence where Chicago Police Officers cover up for Officer Wilfredo Ortiz's misconduct.

22.     After arresting Plaintiff Stephenson, Defendant Officers commenced criminal proceedings against Shondrell Stephenson. There was no probable cause or legal justification to commence criminal proceedings against the Plaintiff.

23.     Subsequent to arresting Shondrell Stephenson, Defendant Officers provided blatantly false testimony against Shondrell Stephenson.

24.     The criminal proceedings against the Plaintiff were all subsequently resolved in a manner affirmative and indicative of the Plaintiff's innocence.

25.     On January 27, 2020, a trial was held to ascertain the guilt or innocence of these false charges placed on Shondrell Stephenson.

26.     On January 29, 2020 at the conclusion of the trial on these false charges a verdict of not guilty was returned on all counts.

27.   Between July 4, 2017 and January 29, 2020, the Plaintiff Shondrell Stephenson was either imprisoned or detained with his liberty deprived, freedom of movement terminated, his person taken and/or significantly restricted for 24 hours a day for 30 months.

28.   On January 29, 2020, after a verdict of not guilty on all counts pertaining to the false charges, 30-months later, Shondrell Stephenson was then finally freed from the clutches of the deprivation of his liberty and the restriction of his person.

29.   At the time that the Plaintiff Stephenson was arrested, Defendant Officers knew that there was no probable cause or legal justification to arrest the Plaintiff.

30.   At the time that the Plaintiff Stephenson was arrested, Defendant Officers knew that Shondrell Stephenson had not committed a crime of any sort.

31.   Despite knowing that Shondrell Stephenson did not commit a crime of any sort the Defendant Officers worked together to knowingly place false charges on the Plaintiff.

32.   And according to Officer Wilfredo Ortiz, Detective Michael Fitzgerald and Detective Tyrone Jackson assisted, joined in and is in part responsible for helping place false charges on Shondrell Stephenson.

33.   At the trial for these false charges, evidence was adduced and entered that revealed the false testimony and reports offered and generated by the Defendant Officers was in no way possibly true.

34.   During the trial, the Defendant Officers' fabrications were exposed by, amongst other things, incontrovertible evidence.

35.   The acts of the Defendant Officers were intentional, willful and wanton and pursuant to the policy or custom of the Chicago Police Department wherein they place false charges on individuals in order to cover up their misconduct.

36.    As a direct and proximate result of the unlawful actions of the defendants, Plaintiff was injured, including physical injuries, pain and suffering, humiliation, embarrassment, fear, emotional trauma, mental anguish, the deprivation of his constitutional rights and dignity, interference with a normal life, lost time, and attorneys' fees.

37.    The City of Chicago continually enables Defendant Officer Wilfredo Ortiz, and others, by repeatedly turning a blind eye to his blatant misconduct since he joined the Police Department in 2008. The Invisible Institute's Citizens Police Database shows that Wilfredo Ortiz ranks in the 99.7th percentile in the frequency of use of force and 89th percentile for civilian allegations. Despite a multiplicity of blatant instances of misconduct, Officer Wilfredo Ortiz has never been disciplined. https://beta.cpdp.co/officer/21455/wilfredo-ortiz/. The City's failure to discipline Ortiz includes the following particularly frightening incidents of misconduct and unlawfulness:

### *The Stephani Jacobs Shooting*

38.    The City's now-defunct Independent Police Review Authority (IPRA) took no action against Defendant Officer Wilfredo Ortiz in relation to the May 25, 2011 shooting, beating, and tasering of Stephani Jacobs. After Ortiz's partner shot five times into Jacobs' vehicle as she was exiting a gas station, striking Jacobs in the left breast and right back, Officer Wilfredo Ortiz and a group of officers took Jacobs into custody, threw her to the ground, and tasered her multiple times. In his use of force report regarding this incident, Ortiz reported that he delivered multiple "open hand strikes" to Jacobs while she was on the ground after being shot and tasered multiple times. IPRA did not impose discipline in relation to this incident, and found Jacobs' shooting justified.

### *Samuel Miller Shooting*

39. In 2013, Defendant Officer Ortiz discharged his firearm at an individual named Samuel Miller. Demonstrating his pattern of patently false police reports, Officer Ortiz claimed that Miller took a "tactical stance" and pointed a black object in his direction. Miller was unarmed and only carrying a cell phone. Once again, the City of Chicago did not take action and Officer Wilfredo Ortiz was not disciplined.

### *Shawn Dobbins Citgo Arrest*

40. On December 16, 2015, Officer Wilfredo Ortiz and Officer Dean Ewing walked into a Citgo Gas Station located at 12304 South Halsted Street, Chicago and arrested Shawn Dobbins. Officer Wilfredo Ortiz (and Officer Dean Ewing) generated false reports against Shawn Dobbins alleging that Shawn Dobbins was aggressive and combative towards Officers Ortiz and Ewing upon entrance into the Gas Station and as a result the Officers subsequently conducted a pat down of Shawn Dobbins and arrested him.

41. The Civilian Office of Police Accountability conducted an investigation into the conduct of Wilfredo Ortiz and upon review of the contemporaneous Citgo Gas Station surveillance video, made findings and conclusions of fact that completely contradict the fabrications of Officer Wilfredo Ortiz. Finding that the conduct as reported by Wilfredo Ortiz (and Dean Ewing) upon entry into the Citgo Gas Station simply did not occur.

42. The Civilian Office of Police Accountability sustained allegations concerning this misconduct against Officer Wilfredo Ortiz finding that he violated rules including disobedience of an order and disrespect to or maltreatment of any person while on or off duty. Despite these initially sustained findings, Officer Wilfredo Ortiz was not disciplined.

*Charles Stokes False Arrest*

43. On November 2, 2015, Defendant Officer Ortiz and his partner Officer Dean Ewing
falsely stopped and arrested Charles Stokes, fabricating a claim that a gun was found
during an unlawful search of Stokes' vehicle. Less than three weeks later, Ortiz and his
partner Dean Ewing unlawfully stopped and falsely arrested Stokes again, this time
taking Stokes' car keys, unlawfully searching his vehicle, and falsely claiming that they
recovered drugs from Stokes.

44. After falsely arresting Stokes for possession of a controlled substance, Defendant Officer
Ortiz and his partner told Stokes and his co-arrestee Curtis Cooper that they needed to
come up with a gun to avoid going to jail.

45. Cooper arranged to purchase a gun to secure Stokes' release. After a gun was tendered,
Stokes was released.

46. Defendant Officer Ortiz and his partner then told Stokes that he needed to get another
gun or Cooper would be jailed. Ortiz and his partner ordered Stokes to obtain or buy an
illegal gun and turn it over to them.

47. Stokes arranged to purchase the weapon and dropped the firearm in a garbage can for
Ortiz and his partner Officer Dean Ewing to retrieve. Video recorded by Stokes shows
the officers retrieving the gun from the garbage can to consummate their scheme.

48. Police reports regarding this incident falsely claim that the officers learned of the location
of multiple firearms during the course of a legitimate narcotics investigation.

49. Defendant Officer Ortiz's actions were reported on in the media after Stokes filed a
lawsuit against Ortiz and the City, Case No. 16-cv-10621.

50. Officer Ortiz's conduct in the Stokes case was also highlighted in the Department of Justice's Investigation of the Chicago Police Department, published January 13, 2017. The Department of Justice found that the Stokes case was a prime example of how the CPD allows abusive officers like Ortiz to set the culture within the Department:

> A recording from November 2015 appears to capture part of a "guns for freedom" incident on video. The video is part of a case in which an individual alleges that police coerced him into producing weapons to gain his own release and the release of a friend. According to the individual who produced the gun, police first required him to tell them where guns were located, and then demanded that he bring them a gun. The man claims he had to buy the gun he brought to the police. The video recording appears to show the man placing the gun in a trash bin and police officers retrieving the gun later that day. The officers' incident report does not mention any arrest and instead claims that the man directed them to "the location of multiple firearms being hidden in the 5th and 22nd district."

> In addition to the likely illegality of this conduct, its impact on community trust cannot be overstated. The fear and anger created by these practices was obvious when we talked with individuals who reported these experiences. As the attorney for the man in the November 2015 incident noted during a media interview, "if there was any trust that's built up by officers on the street, that trust is clearly and quickly destroyed." His words underscore what we found more broadly throughout our investigation: when practices like this are allowed to persist, CPD allows abusive officers to set the culture, undermining the hard work of CPD's many good officers.

51. Despite Defendant Officer Ortiz's misconduct not only being made public in a federal lawsuit and in the media, but also being singled out by the Department of Justice in its official investigative report, the City of Chicago once again took no action.

### *The Williamson Family Shooting*

52. On January 1, 2014, Defendant Officer Wilfredo Ortiz fired 11 shots indiscriminately into a home, striking and seriously injuring active-duty Navy serviceman Michael Williamson, Princeton Williamson and Kierra Williamson, and grazing Thaddeus Williamson.

53. Michael Williamson and Princeton Williamson narrowly escaped death after being shot in the abdomen by Defendant Officer Ortiz. They required emergency surgery and extended hospitalization to save their lives.

54. In order to justify his indiscriminate shooting of four innocent civilians, Defendant Officer Ortiz falsely accused Michael Williamson of taking a "tactical stance" and pointing a gun at him. This was remarkably similar to Ortiz's attempt to justify the previous Miller shooting by claiming that the victim took a "tactical stance" and pointed a black object in his direction.

55. The detective on scene aided in the cover up by fabricating a purported confession from Princeton Williamson. The detective claimed that he took the statement from Princeton while Princeton was in a hospital bed with an open abdomen and receiving a continuous pump of morphine to deal with his excruciating pain. As Princeton's nurses later testified, he was not able to talk while in this condition and could not have possibly given a statement.

56. As a result of these false claims, Michael Williamson and Princeton Williamson were falsely charged with multiple felony offenses.

57. Michael Williamson was found not guilty of all charges after spending a year in Cook County Jail. The criminal court found Officer Ortiz not credible due to the inconsistencies in his version of events, particularly Officer Ortiz's initial admission that he saw approximately five people on the porch and his later claim that the only person he saw on the porch was Michael Williamson.

58. The charges against Princeton Williamson were dismissed after the criminal court threw out the purported confession obtained from Princeton at the hospital. The criminal court

called the purported confession "one of the biggest pieces of garbage I ever heard from a professional member of law enforcement."

59. The Williamson criminal proceedings were reported on in the Chicago Tribune, clearly putting the City of Chicago on notice of Defendant Officer Wilfredo Ortiz's misconduct.

60. Rather than discipline Defendant Officer Ortiz, however, the City of Chicago encouraged him to continue with his fabricated cover up by conducting an investigation that was deliberately designed to clear Ortiz.

61. IPRA found the Williamson shooting justified despite the fact that IPRA: (1) did not interview any of the 17 civilian witnesses at the home, including the Williamsons; (2) failed to consider the results of forensic testing, which showed that Michael Williamson did not possess a gun; (3) did not consider evidence and sworn testimony from the criminal proceedings; and (4) never confronted Ortiz with his inconsistent statements concerning the shooting or the discrepancies between Ortiz's statements and the physical evidence.

62. The McGuire Woods LLP audit of IPRA, published April 12, 2017, specifically highlighted the deficiencies in the investigation of Defendant Officer Ortiz's shooting of the Williamsons, including the failure to address the inconsistencies in Ortiz's version of events, consider physical evidence, or interview civilian witnesses.

63. Yet, even with another publication highlighting Defendant Officer Ortiz's misconduct, Ortiz was not disciplined and the glaring problems with the IPRA investigation were ignored.

64. On August 9, 2014, Michael, Princeton, and Kierra Williamson filed an excessive force suit against Defendant Officer Ortiz and the City, Case No. 14-cv-6397.

65. The suit included a *Monell* policy and practice count asserting that the Chicago Police Department's "Code of Silence" shielded Defendant Officer Ortiz from responsibility for his misconduct and caused him to act with impunity in shooting the Williamsons.

66. The City of Chicago chose to again support Defendant Officer Ortiz's fabricated version of events and argue to the jury that Ortiz was justified because he saw Michael Williamson point a gun at him.

67. The jury rejected Defendant Officer Ortiz's false testimony and returned a $4.75 million verdict for the Williamsons on September 18, 2017. This included a $500,000 award of punitive damages to punish Ortiz and deter him from future misconduct.

68. The Williamsons were also awarded nearly $3.5 million in attorney fees, and the City of Chicago paid substantial amounts to its outside counsel, as a result of the City's decision to blindly defend Defendant Officer Ortiz's fabricated story.

69. Even after the jury verdict, and paying out over $8 million for the Williamson shooting, the City of Chicago did not take disciplinary action against Defendant Officer Ortiz and continues to allow him to wield police power.

70. In fact, the City of Chicago continues to deny reality and maintain that Defendant Officer Wilfredo Ortiz was justified in shooting the Williamsons.

### *The Daniel Pena Brutal Attack*

71. On June 14, 2019, Daniel Pena was viciously attacked from his rear, by Wilfredo Ortiz, by way of a textbook running start rugby form tackle, into his back whiplashing his neck into the concrete sidewalk, executed by Officer Wilfredo Ortiz. The rugby tackle was captured on video in the presence of several Chicago Police Officers, who were there

first, none of whom thought it necessary to effectuate any force of any kind on Daniel Pena.

72. Officer Ortiz generated reports and later testimony completely contradicting what the real time video of the incident captured.

73. Daniel Pena would later file a lawsuit claiming that upon transport to the Chicago Police station at the 20th District, Officer Wilfredo Ortiz continued to beat him while he was in handcuffs, by striking him in the face with a baton, kicking him about the face and the body and later causing his shoulder bone to visibly protrude from his shirt (which was captured by contemporaneous Chicago Police mugshot photographic evidence). Reports were later generated that omitted the significance of Daniel Pena's injuries in an attempt to cover up the heinous conduct of Officer Wilfredo Ortiz. Daniel Pena would later lose the full range of motion in his arm and shoulder as a result of the Wilfredo Ortiz attack.

74. Daniel Pena was later found not guilty of all charges that stemmed from Wilfredo Ortiz's attack.

75. Again, despite the verifiable proof of Wilfredo Ortiz's misconduct, the City of Chicago did not take disciplinary action against Defendant Officer Ortiz and continues to allow him to wield police power.

***The instant matter is emblematic of the City of Chicago's widespread policies***

76. This matter is emblematic of the City of Chicago's acknowledged and well-documented policy and practice of covering up and failing to legitimately investigate officer misconduct and failing to discipline officers who engage in misconduct, otherwise known as the Code of Silence.

77. A number of City officials, including former Mayor Emmanuel, have admitted to the Code of Silence. As Mayor Emmanuel told the City Council in a December 9, 2015 speech: This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues…We cannot ask citizens in crime-ravaged neighborhoods to break the code of silence if we continue to allow a code of silence to exist without our own police department.

78. Former Police Superintendent Richard Brzeczek has publicly stated that a code of silence "has always existed in the police department."

79. Former Patrol Bureau Chief Eugene Williams has explained as follows:

> …The way it is done on the streets is to protect and cover for your partner at all cost, even at the expense of sacrificing every ounce of one's integrity. This culture has been all too evident when we investigate thousands of allegations where the partner of the accused never sees, or hear[s] of any inappropriate conduct although they work in very close proximity of each other during their entire tour of duty. Yet, within this culture it is considered righteous to cut corners and embellish on the facts in a case report or arrest report to win a case in court.

80. This Code of Conduct is reflected in the instant matter where Officer Dean Ewing admits he did not observe Shondrell Stephenson commit any criminal offenses and also admits that he did not witness any of the actions alleged by Wilfredo Ortiz, but still writes reports and testifies based on Wilfredo Ortiz's fabricated lies.

81. The operation of the City's Code of Silence can also be seen in a number of other matters involving the City's failure to legitimately investigate police misconduct, such as Officer Jason Van Dyke's fatal 2014 shooting of 17-year-old Laquan McDonald and a slew of lawsuits filed in this district. *See, e.g., LaPorta v. City of Chicago*, No. 14 C 9665, *Cazares v. Frugoli*, No. 13 C 5626; *Marcinczyk v. Plewa*, No. 09 C 1997; *Obrycka v. City*

*of Chicago*, No. 07 C 2372; *Gilfand v. Planey*, No. 07 C 2566; *Johnson v. City of Chicago*, No. 05 C 6545; *Klipfel v. Gonzales*, No. 94 C 6415; *Garcia v. City of Chicago*, No. 01 C 8945.

82. In fact, in *LaPorta*, a jury determined that the City maintains *de facto* policies of failing to investigate officers accused of misconduct, failing to discipline officers who deserved it, and failing to maintain an early warning system to identify and correct problematic behavior.

83. In *Obrycka*, a jury likewise determined that the City maintains a widespread practice of failing to adequately investigate its police officers and/or tolerating a code of silence within the Police Department.

84. The prevalence of the Code of Silence within the Chicago Police Department was summarized in the Department of Justice's January 2017 report, which found that:

    a. The City of Chicago, police officers, and leadership within CPD and the police union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence;

    b. Officers who simply witness misconduct and face no discipline by telling the truth choose instead to lie to protect other officers;

    c. The City of Chicago treats such efforts to hide evidence as ancillary and unexceptional misconduct, and often does not investigate it, causing officers to believe there is not much to lose if they lie to cover up misconduct;

    d. CPD has failed to hold officers accountable when they use force contrary to CPD policy or otherwise commit misconduct, resulting in officers remaining with the Department and continuing their misconduct when they should have been relieved of duty;

    e. CPD's failure to meaningfully and routinely review or investigate officer use of force is a significant factor in perpetuating practices that result in a pattern of unlawful conduct;

    f. CPD does not hold supervisors accountable for performing basic supervisory tasks, including reporting misconduct. Supervisors generally do not conduct any

follow-up investigation or request any additional information from officers to help understand what happened;

g.  Those cases that are investigated suffer from serious investigative flaws that obstruct objective fact finding, including failure to interview civilian and officer witnesses; inappropriate coordination of testimony, risk of collusion, and witness coaching during interviews; cursory questioning aimed at justifying the officer's actions rather than seeking truth; failure to review and incorporate probative evidence from parallel civil and criminal proceedings; ignoring conflicts in testimony or with physical evidence; exaggerating evidence favorable to the officer; and extensive investigative delays;

h.  The Stokes case shows the CPD allows abusive officers like Wilfredo Ortiz to set the CPD culture;

i.  Due to longstanding, systemic deficiencies in its early intervention systems, the CPD does not adequately and accurately identify officers in need of corrective action and does not consistently or sufficiently address officer behavior even where CPD identifies negative patterns. Because of these failures, CPD officers are able to engage in problematic behaviors with impunity;

j.  The City of Chicago paid over a half billion dollars to settle or pay judgments in police misconduct cases since 2004 without conducting disciplinary investigations in over half of those cases, and only recommending discipline in fewer than 4% of the cases it did investigate.

85. The City's Police Accountability Task Force Report, published in April 2016, similarly found that:

a.  The statistics give real credibility to the widespread perception that there is a deeply entrenched code of silence supported not just by individual officers, but by the very institution of CPD itself;

b.  The only conclusion that can be reached is that there is no serious embrace by CPD leadership of the need to make accountability a core value;

c.  IPRA failed to perform its work fairly, competently, or with rigor or independence, and demonstrated a record of incomplete and botched investigations;

d.  The City of Chicago has sent a clear message that bad police officers are able to act with impunity and that police oversight bodies do not hold police officers accountable;

    e.  When case after high-profile case results in punishment that does not match the gravity of the misconduct, it sends a message that the police can act with impunity and leaves those who break the rules emboldened to continue doing so;

    f.  The City of Chicago has largely ignored information regarding officer misconduct developed in civil rights litigation;

    g.  There continues to be an unacceptably high number of lawsuits filed against the city and individual police officers every year. Despite this persistent problem, which results in the outlay of tens of millions of dollars every year, CPD does not employ a systematic tool for evaluating risk issues identified in lawsuits.

86. The McGuire Woods report also echoed the Department of Justice's findings regarding

    IPRA, including reporting the following deficiencies in IPRA's investigation of

    Defendant Officer Ortiz's shooting of the Williamsons:

    a.  Failing to create a scene diagram and take measurements in a case involving an officer who fired shots that hit multiple individuals, projectiles recovered in numerous locations, and bullet holes identified in multiple places on a porch and in a residence;

    b.  Failing to interview witnesses, including an individual with a visible injury;

    c.  Failing to question the officer about inconsistent statements regarding who was present around the time of the shooting where the officer had previously maintained that multiple people were present, but later stated that only one person was present;

    d.  Failing to confront the officer with photographs contradicting his version of events;

    e.  Failing to evaluate the potential danger to bystanders or fellow officers;

87. Each of these deficiencies reared their ugly head in the unlawful detention and malicious

    prosecution of Shondrell Stephenson.

88. While the City claims to have implemented reforms in response to the well-publicized findings regarding the Code of Silence, such as replacing IPRA with the Civilian Office of Police Accountability, these measures have not addressed the problem.

89. The City of Chicago has not disciplined Wilfredo Ortiz or reviewed any of the glaring deficiencies in its previous investigations, and continues to allow Wilfredo Ortiz to wield a gun and a badge even though Defendant Officer Wilfredo Ortiz himself was singled out not only in the Department of Justice report for his conduct in the Stokes case, but also in the McGuire Woods report for his conduct in the Williamson shooting.

90. Far from addressing the problem, the City of Chicago continues to deny reality and defend thoroughly discredited officers like Defendant Officer Wilfredo Ortiz at every opportunity.

## COUNT I: 42 U.S.C. § 1983 – Unlawful Pretrial Detention

### Against Defendant Officers

91. Plaintiff realleges each of the foregoing paragraphs as if fully set forth herein.

92. The actions of the Defendant Officers, described above, knowingly caused Plaintiff to be arrested, imprisoned and detained without probable cause or any other justification, constituted a deliberate indifference to Plaintiff's right under U.S. Constitution in violation of the Fourth and Fourteenth Amendment.

93. As a proximate result of the above-detailed actions, Plaintiff was injured, including the deprivation of his liberty and the taking and restriction of his person. In addition, the violations proximately caused Plaintiff mental anguish, embarrassment, and humiliation, exposed him to public scandal and disgrace, and caused him to incur various expenses, including but not limited to attorneys' fees, all to Plaintiff's damage.

WHEREFORE the Plaintiff, SHONDRELL STEPHENSON, pursuant to 42 U.S.C.

§1983, demands judgment against the Defendant Officers, ORTIZ, Star #9748, ALTENBACH,

Star #13832, DEAN EWING, Star #8653, MICHAEL FITZGERALD, Star #1738 and TYRONE

JACKSON, Star #21175, 7587 for compensatory damages, punitive damages in excess of

$500,000.00 already levied against the City of Chicago for Wilfredo Ortiz's misconduct, the

costs of this action and attorneys' fees, and any such other and further relief as this Court deems

equitable and just.

### COUNT II: Conspiracy to Deprive Constitutional Rights

### Against Defendant Officers

94.     Plaintiff realleges paragraphs 1-90 as if fully set forth herein.

95.     As described more fully above, Defendant Officers reached an agreement amongst

themselves to punish Plaintiff for a crime he did not commit, and to thereby deprive

Plaintiff of his Constitutional rights, all as described more fully throughout this

Complaint.

96.     In this manner, Defendant Officers, acting in concert with each other, have conspired by

concerted action to accomplish an unlawful purpose by an unlawful means.

97.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and

was an otherwise willful participant in joint activity.

98.     As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's

rights were violated, and he suffered damages, severe emotional distress and anguish, and

a deprivation of his liberty, as is more fully alleged above.

99.     The misconduct described in this Count was undertaken with malice, willfulness, and

reckless indifference to the rights of Plaintiff and others.

100.    As a proximate result of the above-detailed actions of Defendant Officers, Plaintiff was injured, including the deprivation of his liberty. In addition, the violations proximately caused Plaintiff mental anguish, embarrassment, and humiliation, exposed him to public scandal and disgrace, and caused him to incur various expenses, all to Plaintiff's damage.

WHEREFORE the Plaintiff, SHONDRELL STEPHENSON, pursuant to 42 U.S.C. §1983, demands judgment against the Defendant Officers, ORTIZ, Star #9748, ALTENBACH, Star #13832, EWING, Star #8653, FITZGERALD, Star #1738 and JACKSON, Star #21175, 7587 for compensatory damages, punitive damages in excess of $500,000.00 already levied against the City of Chicago for Wilfredo Ortiz's misconduct, the costs of this action and attorneys' fees, and any such other and further relief as this Court deems equitable and just.

## COUNT III: Malicious Prosecution (State Law Claim)

### Against All Defendants

101.    Plaintiff realleges paragraphs 1-90 as if fully set forth herein.

102.    By the actions detailed above, Defendant Officers knowingly sought to and did in fact maliciously prosecute Plaintiff on false charges for which they knew there was no probable cause.

103.    Defendant City is sued in this Count pursuant to the doctrine of *respondeat superior*, in that Defendant Officers performed the actions complained of while on duty and/or in the employ of Defendant City, and while acting within the scope of this employment.

104.    As a direct and proximate result of the malicious prosecution, Plaintiff was damaged, including the value of his lost liberty, exposure to public scandal and disgrace, damage to his reputation, mental and emotional suffering, humiliation, embarrassment, and anguish.

WHEREFORE the Plaintiff, SHONDRELL STEPHENSON, demands judgment against the Defendants, CITY OF CHICAGO and CHICAGO POLICE OFFICERS ORTIZ, Star #9748, ALTENBACH, Star #13832, EWING, Star #8653, FITZGERALD, Star #1738 and JACKSON, Star #21175, 7587 for compensatory damages, punitive damages in excess of $500,000.00 already levied against the City of Chicago for Wilfredo Ortiz's misconduct, the costs of this action and attorneys' fees, post-judgment interest against all Defendants and any such other and further relief as this Court deems equitable and just.

### COUNT IV: 745 ILCS 10/9-102 – Indemnification

105.  Plaintiff realleges each of the foregoing paragraphs as if fully set forth herein.

106.  Defendant City of Chicago is the employer of the Defendant Officers.

107.  Defendant Officers committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

WHEREFORE the Plaintiff, SHONDRELL STEPHENSON, demands that, should any Defendant Officers be found liable on one or more of the claims set forth above, pursuant to 745 ILCS 10/9-102, the Defendant, CITY OF CHICAGO, be found liable for any judgment Plaintiffs obtain, as well as attorney's fees and costs awarded.

### COUNT V – *MONELL* LIABILITY
#### (Against the City)

108.  Plaintiff realleges paragraphs 1-90 as if fully set forth herein.

109.  The Chicago Police Department is a subsidiary division of Defendant City of Chicago. The City maintains and exercises exclusive control over the Department, its policies and procedures, as well as the conduct of all of its employees, including Defendants.

110.   At the time of this incident and prior thereto, there existed within the Chicago Police
       Department a widespread and well-documented policy and practice of covering up and
       turning a blind eye to officer misconduct, and failing to legitimately investigate or
       discipline officers who engage in misconduct, otherwise known as the Code of Silence.

111.   There likewise existed a widespread policy and practice of failing to maintain adequate
       early warning policies or procedures that would identify officers who engage in
       misconduct, like Defendant Officer Wilfredo Ortiz and Officer Dean Ewing, and divert
       them to appropriate training and discipline.

112.   These widespread policies and practices are well known to, tolerated by, and/or enforced
       by policymakers throughout all levels of the Chicago Police Department and the City of
       Chicago administration, who have yet to take effective measures to address the systemic
       problems related to the Department.

113.   As a result of these policies and practices, the City allows officers to act with impunity in
       engaging in misconduct, knowing that their fellow officers (i.e. Dean Ewing), supervisors,
       and City officials will turn a blind eye to and cover up their actions.

114.   Otherwise, well-intentioned officers who would face no discipline for simply telling the
       truth frequently lie to protect officers who engage in misconduct.

115.   These policies and practices were the direct and proximate cause of, and the moving force
       behind, the unlawful pretrial detention and the conspiracy among the Defendant Officers
       that enabled Defendant Officer Ortiz and his partners to maliciously prosecute and
       imprison Shondrell Stephenson for blatantly fabricated charges.

116. The Defendant Officers engaged in this egregious misconduct knowing they would not be questioned or disciplined and that their fellow officers, supervisors, and City Officials would turn a blind eye to and cover up their actions.

117. The City's failure and refusal to legitimately address officer misconduct, demonstrates a deliberate indifference to and tacit approval of unlawful dishonest actions of members of its Police Department, including the conspiracy to deprive Shondrell Stephenson of his Constitutional Rights, committed by the Defendant Officers.

118. As a direct and proximate result of the City's unconstitutional policies and practices, Plaintiff Shondrell Stephenson suffered serious injuries, including mental anguish, embarrassment, and humiliation, exposed him to public scandal and disgrace, and caused him to incur various expenses, including but not limited to attorneys' fees, all to Plaintiff's damage.

WHEREFORE the Plaintiff, SHONDRELL STEPHENSON, pursuant to 42 U.S.C. §1983 demands judgment against the Defendants, CITY OF CHICAGO for compensatory damages, punitive damages in excess of $500,000.00 already levied against the City of Chicago for Wilfredo Ortiz's misconduct, the costs of this action and attorneys' fees, injunctive relief that will address the Defendant's widespread policies and any such other and further relief as this Court deems equitable and just.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully Submitted,

**SHONDRELL STEPHENSON**

By:   /s/ Brandon Brown

*Plaintiff's Attorney*
THE BROWN LAW LTD.
4455 S. King Drive
Suite 100A
Chicago, Illinois 60653
T: (773) 624-8366
E: bbrown@thebrownlaw.com

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies, on oath, that the foregoing, SECOND AMENDED COMPLAINT, was served on all counsel of record via the Court's electronic filing system  or CM/ECF on:

on Monday, April 24, 2023.

/s/Brandon Brown