UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Shondrell Stephenson,

    *Plaintiff*,

v.

City of Chicago, *et al.*,

    *Defendants*.

No. 21 CV 338

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

On July 4, 2017, Chicago police officers entered the house at 10019 South State Street, where Shondrell Stephenson was attending a family barbecue. They detained Stephenson, found a handgun, and arrested him. A jury acquitted Stephenson of gun-related charges, and he brought this lawsuit against two officers.[1] Defendants now move for summary judgment. [Dkt. 162.] On their account, they saw Stephenson in the backyard with a gun, followed him into the house, observed him kneel beside a couch, and found a handgun underneath it: "[t]hat's textbook probable cause." [Dkt. 166 at 7–9 (quoting *Young v. City of Chicago*, 987 F.3d 641, 642 (7th Cir. 2021)).][2] Defendants' citation to *Young* is apt because like in *Young*, "[d]escribing this case decides the outcome." 987 F.3d at 642. Stephenson says that he was in the kitchen, not the living room, when the police arrived; that he was detained there; and that he

---

[1] The City of Chicago is also a Defendant, but the Court bifurcated Stephenson's *Monell* claim against the City [Dkt. 154], and Stephenson's other claim is for indemnification [Dkt. 155 ¶¶ 104–06], which rises and falls with his claims against the officers. *Moran v. Calumet City*, 54 F.4th 483, 500 (7th Cir. 2022). Except where otherwise stated, the Court's references to the Defendants relate only to the officers.

[2] Citations to briefs refer to the printed-on pagination; citations to exhibits refer to the electronic pagination generated by ECF, which may differ.

never possessed a gun or went near the couch where the gun was found. [Dkt. 177 at 8–9.] "Where the parties present two vastly different stories—as they do here—it is almost certain that there are genuine issues of material fact in dispute." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Those disputes mean that the motion for summary judgment must be denied on the merits, and they also preclude awarding qualified immunity at this stage. *See Gant v. Hartman*, 924 F.3d 445, 448 (7th Cir. 2019).

## I.    Background

As Defendants correctly observe, "Stephenson asserts that virtually every fact is disputed—including the officers' job assignments on July 4, 2017." [Dkt. 186 at 1.] Many of the facts the parties assert and dispute are immaterial, and a comprehensive discussion would be cumbersome. Instead, the Court draws on the parties' Local Rule 56.1 statements to present Stephenson's and Defendants' dueling accounts of the events of July 4, 2017 and its aftermath. The Court treats facts not properly disputed as admitted for present purposes. N.D. Ill. Loc. R. 56.1(c)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).[3] The Court omits many immaterial facts and disputes from its account below; it discusses those facts in the analysis section to the extent necessary to address the parties' legal arguments.

On July 4, 2017, Stephenson and his girlfriend, LaRhonda Harris, attended a cookout with friends and family at 10019 South State, the home of LaRhonda's

---

[3]    The Court granted Defendants' motion to strike Julie Harris's affidavit by separate opinion issued today, so that affidavit cannot be used to support or dispute factual assertions.

mother and grandmother. [Dkt. 176 ¶ 7; Dkt. 186 ¶ 1.][4] Three Chicago police officers—Defendants Wilfredo Ortiz and Adam Altenbach, plus Dean Ewing—were in the area in an unmarked police car; Ewing was driving. [Dkt. 176 ¶¶ 13–14.] The parties agree on that much, but they sharply dispute what happened next.

According to Defendants, they were driving past 10019 South State when Ortiz saw someone, later identified as Stephenson, displaying a handgun in the backyard. [*Id.* ¶¶ 14–15.] Ortiz alerted the others to the gun and exited the car; Altenbach followed, and Ewing parked in front of the home. [*Id.* ¶¶ 17–19.] Stephenson looked toward Ortiz, then turned and walked into the home. [*Id.* ¶ 20.] Ortiz followed several feet behind Stephenson, and Altenbach was behind Ortiz. [*Id.* ¶¶ 22–23.] Inside, Ortiz saw Stephenson run to the front of the house with the gun, turn, kneel, and place the gun under a couch; Ortiz grabbed Stephenson and ordered him to sit down. [*Id.* ¶¶ 26–30.] Altenbach arrived, and Ortiz told him to watch Stephenson while he recovered the handgun from under the couch. [*Id.* ¶¶ 31–34.]

Stephenson tells a different story. After he arrived at 10019 South State Street, he said hello to the people in the backyard, and then he went inside. [*Id.* ¶¶ 10, 12; *see id.* ¶ 24.] Stephenson was in the kitchen making himself a Polish sausage when Ortiz and Altenbach entered the house. [Dkt. 185 ¶ 7.][5] He denies being outside when

---

[4]        Hereafter, the Court refers to LaRhonda and Julie Harris by first name.

[5]        Defendants argue that the evidence Stephenson cites does not support the assertion that he was in the kitchen making a Polish when the police entered the home. [Dkt. 185 ¶ 7.] Even disregarding Julie's affidavit, the Court disagrees. Stephenson testified that he and LaRhonda were "right there making Polishes." [Dkt. 163-4 ("Stephenson Dep.") at 121:13–:16; *see also id.* at 114:14–:16 ("Q. … Where are you standing [when the officer grabbed you]? A. I'm still in the kitchen."), 121:17–122:10 (testimony about Stephenson and the others being

the officers arrived, possessing or running with a gun, or being near the couch under which the gun was found. [*See* Dkt. 163-3 ("Trial Tr.") at 220–21 (Stephenson's trial testimony that he did not have a gun); Stephenson Dep. at 121:13–:16 (he was in the kitchen when he was grabbed), 153:2–:4 (denying that he ran).][6]

The officers ran Stephenson's name, learned that he was a convicted felon who was not authorized to have a gun, and placed him under arrest. [Dkt. 176 ¶¶ 35–37.] At the police station, Stephenson said that if the police found a gun, it was not his. [*Id.* ¶¶ 38–39.][7] The officers filled out an arrest report that summarized their account of the arrest. [*Id.* ¶ 40; Dkt. 163-12.] Defendants assert that Ortiz spoke to Detectives Michael Fitzgerald and Tyrone Jackson, who were assigned to the case. [Dkt. 176 ¶ 41.] Stephenson disputes this, but the dispute is immaterial because by Defendants' own account, the detectives' only role in the investigation was passing Ortiz's account to the prosecutor, Assistant State's Attorney ("ASA") Katie Siefert.[8] Siefert then

---

in the kitchen).] LaRhonda testified that she was going to the kitchen to fix a Polish and that Stephenson "was going to do the same thing. By the time he was going and grab[bing] it, that's when the officer grabbed him." [Dkt. 176-9 ("LaRhonda Dep.") at 80:3–:11.] Although LaRhonda's testimony can be read to mean that Stephenson had not yet reached the kitchen to make a Polish [*see also* Dkt. 185 ¶ 7 (offering other deposition testimony that can be read to contradict Stephenson's account)], the Court must construe the record in the light most favorable to Stephenson, the nonmovant. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013). Stephenson's testimony is sufficient to create a genuine dispute of fact on this issue.

[6]  While Stephenson uses Julie's affidavit to support these facts in his Local Rule 56.1 statement of additional facts [Dkt. 185 ¶¶ 10–12], he disputes Defendants' assertions to the contrary, and the evidence cited above creates a genuine dispute as to those facts.

[7]  It is disputed whether Stephenson waived his *Miranda* rights or told the officers that he ran because he had marijuana on him. [Dkt. 176 ¶¶ 38–39.]

[8]  [*See* Dkt. 176 ¶ 41 ("[Ortiz] told [the detectives] about the events that occurred and answered their questions."); ¶ 42 ("The detectives then contacted … the Cook County State's Attorney's Office to assess whether felony charges were appropriate.").] Defendants object to Stephenson's responses to these and other paragraphs in their Local Rule 56.1 statement and ask the Court to deem paragraphs 41–52 admitted. [Dkt. 186 at 5 n.4.] The Court declines to

"prepared a 'Fact Sheet' that memorialized the information provided to her by the detectives." [*Id.* ¶ 43; Dkt. 163-15.] Siefert approved armed habitual criminal charges against Stephenson. [Dkt. 163-15 at 2 ("App Chgs: 720 ILCS 5/24-1.7(a)"); *see* Dkt. 163-14 (Siefert Dep.) at 69:15–:23.][9]

A criminal complaint was filed, and a Cook County bond judge found probable cause to detain Stephenson. [Dkt. 176 ¶¶ 48–49; Dkt. 185 ¶ 27.] Ewing testified before a grand jury, which returned a five-count indictment for firearms offenses. [Dkt. 176 ¶¶ 50–52.] Stephenson was held in Cook County Jail until March 7, 2018, when he posted bond; he remained under house arrest afterward. [*Id.* ¶ 53.] Stephenson was tried by a jury and acquitted on January 29, 2020. [*Id.* ¶ 54.]

Stephenson then filed this civil suit against Ortiz, Altenbach, and the City of Chicago. [Dkt. 1.] Stephenson's operative complaint brings 42 U.S.C. § 1983 claims against the individual Defendants for unlawful pretrial detention and conspiracy to

---

do so because it disagrees that Stephenson's responses are improper. He cites record evidence in each paragraph of his response. [*See* Dkt. 176 ¶¶ 41–52.] Some sentences lack citations to the record, such as the one Defendants' brief discusses, but that is the fifth sentence of the paragraph, following four sentences including record citations. [*See id.* ¶ 41.] It synthesizes the foregoing evidence to dispute the materiality of the asserted fact and disputes that the evidence Defendants cite support that fact. [*Id.*] These responses are proper, and even if they were not, they would not warrant deeming paragraphs 41–52 admitted in their entirety. The Court would excise offending material, as it has done with Julie's affidavit.

[9] Stephenson disputes that Siefert approved the charges because she testified that she had no memory of the case. [Dkt. 176 ¶ 43.] But a witness saying that she does not remember something happening is not the same as denying that it happened. *Cf. Ybarra v. City of Chicago*, 946 F.3d 975, 980 (7th Cir. 2020) (explaining the similar principle that a witness testifying that she did not hear police shout a command does not necessarily create a triable issue of fact as to whether the police actually gave the command). Thus, Stephenson appears to have no evidence to dispute the content of the fact sheet, which is likely admissible as a record of a regularly conducted activity. *See* Fed. R. Evid. 803(6). The Court need not finally resolve the admissibility of the fact sheet now, however, because even assuming that Siefert approved the charges, Stephenson would prevail on summary judgment.

deprive constitutional rights, and a state law malicious prosecution claim. [Dkt. 115.] Defendants now move for summary judgment. [Dkt. 162.]

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors*, 714 F.3d at 532 (citation omitted). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (internal quotation omitted).

## III.    Analysis

"The central issue in this case is whether [Defendants] had probable cause to detain [Stephenson] during the pendency of his criminal case." [Dkt. 166 at 1.] If they did, then all three claims against them fail because probable cause is a defense to unlawful pretrial detention and malicious prosecution claims, and the conspiracy claim requires there to be an underlying constitutional violation. If probable cause was absent, however, then Stephenson's claims may proceed. This case is a classic swearing contest: Defendants tell one story; Stephenson tells another. Such a case

6

cannot be resolved at summary judgment. *Payne*, 337 F.3d at 770. Viewing the record in Stephenson's favor, Defendants are entitled to neither summary judgment on the merits nor qualified immunity.

### A.  Pretrial Detention Claim

Stephenson's primary claim is for unlawful pretrial detention under 42 U.S.C. § 1983. "Pretrial detention is a 'seizure'—both before formal legal process and after. The Fourth Amendment establishes the standards and procedures governing pretrial detention in criminal cases." *Washington v. City of Chicago*, 98 F.4th 860, 868–69 (7th Cir. 2024) (cleaned up). Therefore, a claim for unlawful pretrial detention asserts that police officers "caus[ed] [the plaintiff] to be detained before trial without probable cause." *Id.* at 869 (citation omitted). Conversely, the presence of probable cause is a defense to an unlawful pretrial detention claim. *Id.* at 863. "Probable cause exists when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspect committed an offense defined by state law. The … inquiry is purely objective, and the officer's subjective state of mind and beliefs are irrelevant." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023) (cleaned up).

Defendants raise two principal arguments in support of their position that the pretrial detention claim fails.[10] First, even viewing the evidence in the light most

---

[10]     Defendants' opening brief also touches on two other arguments. First, it suggests that they are absolutely immune to the extent that Stephenson's claims are based on Defendants' false trial or grand jury testimony. [Dkt. 166 at 10 & n.3.] Defendants are correct, but Stephenson does not pursue perjury claims, so Defendants' absolute immunity from § 1983 liability is not applicable here. [*See* Dkt. 177 at 9.] Moreover, if Defendants' false testimony repeated a story they invented, immunity as witnesses would not shield them from liability if their initial fabrication caused Stephenson's detention. *Cf. Moran*, 54 F.4th at 498–99

favorable to Stephenson, no reasonable jury could find that they lacked probable cause. Second, Stephenson cannot overcome the judicial finding of probable cause or the grand jury's indictment. The Court disagrees on both points.

### 1. Record Evidence

In their opening brief, Defendants argue that the "undisputed" facts establish that probable cause existed, but Stephenson disputes those facts. [*Compare* Dkt. 166 at 6–9, *with* Dkt. 176, 177.] In their reply, Defendants argue that these disputes do not defeat probable cause [Dkt. 186 at 6–10], but they fail to construe the record in the light most favorable to Stephenson. A reasonable jury viewing the record in that light could find that probable cause was absent.

Recall Stephenson's story. *See supra* at 3–4. He was making a Polish in the kitchen when Ortiz and Altenbach entered the home and detained him where he stood. Stephenson never ran from the officers and was not holding a gun. A jury that credited Stephenson's account could find that he was not in the backyard when the officers drove by. Once it made that finding, it could also find that Ortiz's contradictory account—seeing Stephenson display a gun in the backyard—was a lie. If this line of reasoning seems simplistic, that is because it is. The time to resolve inconsistent stories is at trial, not on a motion for summary judgment. *Payne*, 337 F.3d at 770–71; *see Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013–14 (7th Cir. 2006) ("The question of probable cause is typically a proper issue for a jury if there is

---

(analyzing a claim for fabrication of evidence in part based on whether a defendant police officer repeated the fabricated story at trial). Second, Defendants argue that the fact that they entered the 10019 South State property without a warrant is immaterial. [Dkt. 166 at 11.] This is correct, but Stephenson does not dispute the point. [*See* Dkt. 177 at 10–11.]

room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." (cleaned up)).

Defendants' attempts to avoid this conclusion fail. First, they argue that even under Stephenson's version of events, reasonable officers in their shoes would have believed that Stephenson possessed the gun. [Dkt. 186 at 6–7.] *Cf. Fox v. Hayes*, 600 F.3d 819, 834 (7th Cir. 2010) (explaining that in the similar context of a jury verdict, the plaintiff's version of events governs, but "probable cause is determined from the perspective of what the officers knew at the time of the arrest"). This is so, Defendants submit, because Stephenson moved evasively and was in proximity to the gun Ortiz recovered. [Dkt. 186 at 7–10.] But in pursuing this line of argument, Defendants do not give Stephenson the benefit of construing the facts and drawing *all* reasonable inferences in his favor. *See Majors*, 714 F.3d at 532. On the proper view of the record, material factual disputes remain.

*Evasive movements*. Defendants argue that a reasonable officer would have interpreted Stephenson's walking from the backyard into the house when the officers drove by as flight. [Dkt. 186 at 8–9.] But Stephenson does not admit to being in the backyard when the officers arrived; he testified that he was in the kitchen. [*See* Stephenson Dep. at 121:13–:16; Trial Tr. at 218:12–:18.] True, other testimony can be read to indicate that Stephenson was entering the house as the police were arriving. [*See, e.g.*, LaRhonda Dep. at 80:9–:11 ("By the time [Stephenson] was going and grab[bing] [the Polish], that's when the officer grabbed him.").] But a jury, not the Court, must resolve that kind of factual dispute. *Johnson*, 936 F.3d at 705; *see*

9

*Payne*, 337 F.3d at 771 (explaining that the nonmovant need not match the movant witness for witness). Defendants' arguments about inferences police may draw from evasive movements therefore miss the mark because a jury would not be compelled to find that Stephenson made such movements. [*Contra* Dkt. 186 at 8–9.]

*Proximity to the gun.* Defendants argue that a reasonable officer would have believed that Stephenson had constructive possession of the gun due to his proximity to it. [*Id.* at 7–8, 9–10.] Defendants are correct that Stephenson did not properly dispute the fact that Ortiz discovered the gun beneath a couch. [*Id.* at 9 n.8 (noting that Stephenson's testimony that he did not see Ortiz recover a gun does not create a genuine dispute as to that fact); *see* Dkt. 176 ¶¶ 33–34.] But Stephenson's proximity to the couch and, by extension, the gun *is* in dispute. [*See* Stephenson Dep. at 116:8– :25 (testifying that he was in the kitchen when he was detained and agreeing that he "sat by a chair in the kitchen"), 121:21–:23 (similar), 124:12–:22 (describing the front room as having two small couches and testifying that he "never made it to the front room").] Defendants quibble with Stephenson's language, saying "it does not matter whether the gun was recovered from under a couch, or a 'chair' as Stephenson called it, or some other piece of furniture because Stephenson admitted that the officers were searching the area where he was standing." [Dkt. 186 at 9.][11] This argument is

---

[11]     Defendants place too much weight on Stephenson's "admission" that officers searched the area where he was detained because Stephenson did not admit that Defendants found a gun while searching the area around him. [Stephenson Dep. at 133:25–137:4 (saying that the officers "say they found something" but that he did not see them find anything, and testifying that he saw the officers searching the area around him but not the living room).] While Stephenson initially indicated he saw the officers searching the living room "by the kitchen," he later clarified that he did not see them search the living room. [*See id.* at 134:15–137:5.]

self-defeating. By arguing that what Ortiz calls a "couch" in the living room area is the same piece of furniture that Stephenson calls a "chair" in the kitchen area, Defendants implicitly identify an ambiguity in the record. The Court cannot resolve inferences in Defendants' favor at this stage; the argument that Stephenson's "chair" is Ortiz's "sofa" must be submitted to a jury. *See Johnson*, 936 F.3d at 705.[12]

There are genuine disputes as to whether Stephenson ran from the officers and how close he was to the couch (or chair) under which Ortiz found the gun. At this stage, therefore, the Court must accept Stephenson's account: he was in the kitchen, not the backyard, when the officers arrived; he did not run from them; and he was detained in the kitchen, not the living room. In other words, Stephenson was minding his own business, preparing himself a Polish in the kitchen, when the officers entered and detained him and found a gun in a different area of house. With no pursuit, evasive movements, or immediate proximity to the gun, a reasonable officer could not believe that Stephenson had committed a crime, so Defendants lacked probable cause to arrest him. *See Pierner-Lytge*, 60 F.4th at 1043; *United States v. Richards*, 719 F.3d

---

Even assuming that the initial reference to the living room was a concession that the gun was found near Stephenson, a jury could credit this clarification, so the Court cannot hold as a matter of law that the gun was recovered from Stephenson's immediate vicinity.

[12] Things might be different if there was objective evidence that resolved where each person was relative to where the gun was found. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). But Defendants have offered no such evidence. The officers were not wearing cameras, nor does the record contain photos taken on July 4, 2017 or even a floor plan of the house.

746, 757 (7th Cir. 2013) ("[M]ere proximity to suspected criminal activity does not, without more, generate probable cause.").[13]

## 2. Presumptions of Probable Cause

Defendants also argue that the Court must presume they had probable cause because a judge found probable cause to detain him and a grand jury returned an indictment, and Stephenson cannot rebut these presumptions. [Dkt. 186 at 2–3.] A judicial probable cause determination is "ordinarily entitled to a presumption of validity, and an indictment is prima facie evidence of probable cause." *Washington*, 98 F.4th at 869 (cleaned up). These presumptions can be rebutted "when legal process itself goes wrong—when, for example, a judge's probable-cause determination is

---

[13]     The cases Defendants cite to support probable cause or constructive possession [Dkt. 166 at 7–9; Dkt. 186 at 6–10] are distinguishable because in each case, it was proven or not disputed that there was something more than the suspect's mere presence in the general vicinity of a crime. *See Young*, 987 F.3d at 644 (gun found "right next to" the suspect in the car he was driving); *Morales v. City of Chicago*, 2023 WL 1341972, *4–5 (N.D. Ill. Jan. 31, 2023) (gun found behind the rain barrel that the suspect was climbing over); *Alcorn v. City of Chicago*, 2022 WL 4537250 (N.D. Ill. Sept. 28, 2022) (the suspect picked something up and dropped it behind the bench he was sitting on; narcotics were found under the bench); *cf. Matz v. Klotka*, 2012 WL 12871470, at *5 (E.D. Wis. Mar. 8, 2012) (a *Terry* stop of a suspect who ran was permissible when it was undisputed that at least one gang member was on a porch and the group scattered when police approached); *People v. Feliciano*, 2023 IL App (2d) 200421-U ¶ 36 (the suspect's immediate retreat from officers supported the inference he was hiding something); *People v. Ross*, 947 N.E.2d 776, 767 (Ill. App. Ct. 2011) (the defendant leaving a car when police approached supported the inference that he possessed the gun found inside); *People v. Ingram*, 907 N.E.2d 110, 115 (Ill. Ct. App. 2009) (sufficient evidence to convict the defendant who ran from a car where a gun was found and gave police a false name); *People v. Peete*, 743 N.E.2d 689, 692–93 (Ill. Ct. App. 2001) (evidence sufficient to convict where the defendant ran from police and reached in his waistband, and a gun was found in his flight path); *People v. Williams*, 640 N.E.2d 1275, 1281 (Ill. App. Ct. 1994) (affirming conviction for gun possession where the defendant threw the gun into a trash can); *People v. Moreno*, 2015 IL App (2d) 131123-U ¶ 12 (sufficient evidence of gun possession by a defendant who was in the area of a "shots fired" call, acted nervous, ran from the police, and was detained near a gun); *People v. Parsons*, 2017 IL App (1st) 151036-U ¶ 17 (sufficient evidence to convict a defendant whose fingerprint was on a magazine, who knew two others who led police on a foot chase near where a gun was recovered, and who had previously owned the same type of gun).

predicated solely on a police officer's false statements." *Id.* at 869–70 (quoting *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017)). A plaintiff bears the burden of overcoming the presumptions, which he does via the "*Beauchamp* test." *See id.* at 863–64 & n.1; *Beauchamp v. City of Noblesville*, 320 F.3d 773 (7th Cir. 2003).

*Washington* framed the *Beauchamp* test as requiring (1) "that the officer who sought the warrant knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer" and (2) "that the false statements were necessary to the judicial officer's determination that probable cause existed for the arrest." 98 F.4th at 870 (cleaned up). But the test applies more broadly than the arrest warrant context. *See id.* at 871 (indicating that plaintiffs could satisfy the first prong with evidence "that the police detectives deliberately misrepresented certain inculpatory evidence and omitted exculpatory evidence in their communications to the prosecutors, the bail hearing courts, and the grand jury"). The Court considers each inquiry in turn.[14]

### 3.    *Beauchamp* Step 1: False Statements

Defendants argue that because Stephenson presents no evidence that Ortiz and Altenbach misrepresented facts to a prosecutor, judge, or grand jury, Stephenson fails to rebut the presumption of probable cause at *Beauchamp* step 1. [Dkt. 186 at 3.] The Court disagrees.

---

[14]    In their reply brief, Defendants explain that they have rearranged their argument to mirror *Washington*, with the result of incorporating their proximate cause argument into their *Beauchamp* analysis. [*See* Dkt. 186 at 2–6.] The Court follows Defendants' lead and addresses proximate cause within the *Beauchamp* framework.

At the outset, the Court considers whether Stephenson must produce evidence that Defendants personally made false representations to a prosecutor, judge, or grand jury. The Court answers that question no. In *Manuel*, the Supreme Court explained that a plaintiff can bring an unlawful pretrial detention "when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." 580 U.S. at 367. The use of "for example" makes clear that the scenario *Manuel* described is one way the legal process could result in a detention without probable cause, but not the only way. Similarly, the Seventh Circuit has explained that the presumptions of probable cause are "premised on an assumption that there will be a *truthful* showing of probable cause," *Washington*, 98 F.4th at 870 (cleaned up), and that the presumption based on an indictment "may be rebutted by evidence that law enforcement obtained the indictment through improper or fraudulent means," *Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019) (citations omitted). These decisions indicate that the focus is on the truthfulness of the information before the judge or grand jury and the propriety of the police officers' role in putting that information there. The Court holds that a plaintiff meets his burden at *Beauchamp* step 1 if he shows that police officers intentionally, knowingly, or recklessly provided false information—or caused such information to be provided—to a prosecutor, judge, or grand jury.

Stephenson's evidence is sufficient to avoid summary judgment at *Beauchamp* step 1. Defendants point out that there is no evidence that they provided information directly to ASA Seifert, the bond judge, or the grand jury. [Dkt. 186 at 3.] But as the

Court has just explained, they need not personally have provided the information to a judicial officer, as long as it came from them. Here, there is a direct line from Ortiz and Altenbach to the bond judge and the grand jury. Defendants assert that Ortiz spoke to Detectives Fitzgerald and Jackson, who then passed that information along to ASA Seifert, who approved felony charges. [Dkt. 176 ¶¶ 41–44.] A Cook County judge found probable cause to detain Stephenson; the record does not specifically reveal the basis for the finding of probable cause, but a reasonable inference is that it was Ortiz and Altenbach's story about arresting Stephenson and finding him in close proximity to a gun. [*See id.* ¶ 48.] Ewing was the sole grand jury witness; he testified that he, Ortiz, and Altenbach had seen Stephenson in the backyard and that the gun found under the couch was in Stephenson's possession. [Dkt. 163-18.] Ewing did not see Stephenson with the gun or enter the house [Dkt. 176 ¶¶ 19–23, 26–34], so it is reasonable to infer that Ewing's grand jury testimony was based on what Ortiz and Altenbach told him about their pursuit and detention of Stephenson.[15] Thus, a reasonable jury could find that Ortiz and Altenbach's account of July 4, 2017, was put before ASA Seifert, the bond judge, and the grand jury.

---

[15]     Defendants argue that "Stephenson appears to concede that the grand jury was not misled" because "he says he is not trying to hold anybody liable for their perjured testimony." [Dkt. 186 at 3 n.2; *see* Dkt. 177 at 9.] Defendants misconstrue the point of that concession. In that section of Stephenson's brief, he was addressing Defendants' argument that they have absolute immunity for any testimony they made in court. [*See* Dkt. 166 at 10 & n.3; Dkt. 177 at 9.] Stephenson clarified that his claims arose out of Defendants' conduct on July 4, 2017 and thereafter because Defendants—and Ewing—cannot be sued under § 1983 for perjury. *See supra* note 10. Acknowledging immunity is not equivalent to agreeing that the grand jury was not misled. Separately, Ewing might have given truthful testimony, and the grand jury could still have been misled, if Ortiz and Altenbach lied to Ewing. If true, Stephenson may still have a claim against Defendants if they caused the indictment to be "obtained … through improper or fraudulent means." *Coleman*, 925 F.3d at 351.

A reasonable jury could also find that Ortiz and Altenbach knew their story was false or were reckless as to its truth or falsity. *See Washington*, 98 F.4th at 870. As explained above, a reasonable jury could credit Stephenson's testimony and find that he was inside, not in the backyard, when the police drove by, and he was detained in the kitchen, not the living room area. If Stephenson's account is true, then Ortiz would not have seen Stephenson in the backyard with a gun, seen him place a gun under a couch, or found the gun within his reaching distance. And Altenbach would have entered the house and seen Stephenson detained in the kitchen, not near the living room where the gun was found. A jury could find: (1) that Ortiz intentionally misrepresented these facts in his reports and accounts of that day because he did not recount what he actually saw and did, and (2) that Altenbach was reckless as to truth when he recounted the same events, because what Ortiz said happened did not match what Altenbach saw when he entered the house.

Because there is sufficient evidence in the record to permit a reasonable jury to find that Defendants intentionally, knowingly, or recklessly caused false evidence to be presented to the bond judge and the grand jury, Stephenson has met his burden at *Beauchamp* step 1. *See Washington*, 98 F.4th at 870.

### 4. *Beauchamp* Step 2: Materiality

Next, Defendants argue that any misrepresentations that were made were not necessary to the bond judge's finding of probable cause or the grand jury indictment. [Dkt. 186 at 4; *see also* Dkt. 166 at 12–13.][16] According to Defendants, ASA Siefert

---

[16]    The *Beauchamp* step 2 analysis subsumes Defendants' proximate cause argument. [*See* Dkt. 186 at 2 (reframing the proximate cause argument pursuant to *Beauchamp*).]

"did an independent investigation into the facts before approving charges and presenting the case to central bond court and the grand jury," which breaks the chain of causation. [Dkt. 186 at 43.]

Investigation by the prosecutor can break the chain of causation for a claim against police officers, but only if the prosecutor's investigation is separate from the alleged misconduct by the officers. In *Washington*, it was undisputed at summary judgment that a prosecutor "independently spoke to" the defendant detectives, "re-interviewed witnesses," and had access to the medical examiner and medical records. 98 F.4th at 873–74 (cleaned up). The prosecutor passed the information to a colleague, who approved charges against the plaintiff. *Id.* at 874. The Seventh Circuit explained that on the record in *Washington*, any misconduct by the defendants could not have "duped the State's Attorney into seeking pretrial detention or pursuing grand-jury indictments." *Id.* (quotation omitted). Here, however, the only evidence that was undisputedly before ASA Siefert came from Defendants; the evidence that Siefert conducted an independent investigation is at best disputed.

Defendants argue that Siefert "independently spoke to the detectives and prepared a Fact Sheet that memorialized the information they provided to her." [Dkt. 186 at 4–5 (citations omitted).] Defendants describe the situation as follows:

> The Fact Sheet confirms that the state's attorney's office knew Officer Ortiz observed Stephenson displaying a gun to a group of individuals in the backyard; that Stephenson fled into the house; and that a gun was recovered from under a couch where he was standing. The state's attorney's office also knew that Stephenson did not live at the residence and denied possessing the gun.

[*Id.* at 5 (citations omitted).] Three words are missing from Defendants' description. To be accurate, it should state that the prosecutors knew Officer Ortiz *said that he* observed Stephenson displaying a gun and so on. The Fact Sheet confirms that the information before Siefert was based on the officers' observations, which the record discloses was Ortiz's claim that he saw Stephenson with a gun and chased him inside, with Altenbach's corroboration that he saw Stephenson near the couch, after which Ortiz recovered a gun from beneath it. At summary judgment, the Court must assume that Ortiz and Altenbach's story is false and Stephenson's is true. *See Majors*, 714 F.3d at 532. The Fact Sheet does not indicate that Siefert had a source of information other than the officers' account, perhaps relayed to her via detectives.[17] Therefore, Siefert's involvement does not break the chain of causation because the record lacks undisputed evidence that she conducted an investigation that was independent of Defendants' story. *Cf. Washington*, 98 F.4th at 873–74 (finding that an investigation was independent when a prosecutor re-interviewed witnesses).

Siefert's deposition is no more helpful to Defendants. Defendants note that she testified that the information in the Fact Sheet "would have come from either a police officer or detective as well as civilian witnesses, videos, [and] reports." [Siefert Dep. at 47:9–:11; *see* Dkt. 186 at 3–4.] But Siefert was testifying generally about sources of information if she had written the Fact Sheet, which she did not remember doing.

---

[17]    The parties dispute whether detectives were actually involved in the investigation, but this dispute is immaterial for purposes of summary judgment because Defendants assert only that they told the detectives their story and the detectives passed it along to the prosecutors. [Dkt. 176 ¶¶ 41–42.] Defendants do not assert that the detectives independently gathered evidence that could render their alleged misconduct not a proximate cause of Stephenson's detention. *Cf. Washington*, 98 F.4th at 873–74.

[*See* Siefert Dep. at 46:4–47:24.] A jury would not be compelled to find that Siefert reviewed material besides Defendants' account when making the charging decision. For the same reason, Siefert's testimony that she would verify the information that she received would not require a jury to find that Siefert did not rely solely on Ortiz's and Altenbach's statements. [*See* Dkt. 186 at 5 n.4.] In fact, Siefert testified that one way she checked the accuracy of information was by reviewing statements of officers. [Siefert Dep. at 14:18–15:8 (explaining that determining whether there is sufficient evidence to charge a suspect requires "collect[ing] information and gather[ing] facts," which may come from "detectives [or] police officers").] It is disputed whether Siefert charged Stephenson based on evidence independent of Defendants' story. Therefore, the Court cannot say as a matter of law that an investigation by Siefert breaks the chain of causation between Defendants' misconduct and Stephenson's detention.

Defendants also argue that the fact that the bond judge found probable cause to detain Stephenson and the grand jury indicted him mean that they were not the proximate cause of Stephenson's detention. [Dkt. 186 at 6.] This argument fails. The record reflects that the only evidence that could have been used to establish probable cause on July 5, 2017 was Ortiz's and Altenbach's testimony. [*Cf.* Dkt. 176 ¶ 49 (asserting only that "a Cook County judge found probable cause to detain Stephenson" but not citing evidence to show what the basis for that finding was).] And the only witness to testify before the grand jury was Ewing. [Dkt. 163-18.] In both cases, a jury could find that the basis for the probable cause determination and the indictment was Defendants' story, which the Court assumes to be false for present purposes. [*See*

Dkt. 177 at 11–12.] These probable cause determinations do not shield Defendants from liability because on this record, a jury could find that there was not a truthful showing of probable cause. *See Washington*, 98 F.4th at 870.

*     *     *

A reasonable jury that credited Stephenson's testimony instead of Defendants' could find that Defendants lacked probable cause to arrest and detain Stephenson. A jury could also find that Defendants' testimony formed the basis of ASA Siefert's decision to pursue charges, the bond judge's probable cause finding, and the grand jury's indictment. These factual disputes must be resolved by a jury after trial, not by the Court at summary judgment. Defendants' motion for summary judgment on the merits of Stephenson's wrongful pretrial detention claim is therefore denied.

## B.    Qualified Immunity

Stephenson must also defeat qualified immunity, which Defendants argue protects them even if they arrested Stephenson without probable cause. [Dkt. 166 at 13–18; Dkt. 186 at 10–14.] "'Officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.' A party seeking to defeat qualified immunity must show both elements; on the other hand, the defendant obtains qualified immunity by blocking either part." *Holloway v. City of Milwaukee*, 43 F.4th 760, 767 (7th Cir. 2022) (internal alteration omitted) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63, (2018)). "Qualified immunity is an affirmative defense, but once the defendant raises it, the burden shifts to the plaintiff to defeat it." *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021) (cleaned up).

20

The Court has already determined that Stephenson satisfies the first prong of the qualified immunity analysis because a jury could find that Defendants violated his Fourth Amendment rights. The question is whether there are factual disputes as to whether Defendants violated clearly established law. The Court concludes that there are, which precludes summary judgment. *See Gant*, 924 F.3d at 448.

### 1. Arguable Probable Cause

Under Seventh Circuit precedent, the way to analyze qualified immunity in the context of a false arrest or wrongful detention claim is to determine whether the officers had "arguable probable cause." *Mwangangi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022) (citation omitted).[18] Arguable probable cause exists if "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law," and when an officer has arguable probable cause, then he does not violate clearly established law. *Id.* (cleaned up). Because the Court construes the record in the light most favorable to Stephenson at summary judgment, and qualified immunity depends on which version of the facts is true, it must be denied. *See Gant*, 924 F.3d at 448.

Here, factual disputes preclude qualified immunity at this stage, as Defendants' submissions make clear. Their opening brief frames the question at issue

---

18       Defendants suggest that their having arguable probable cause not violating a clearly established right are two independent bases to hold that they are immune from liability. [*Compare* Dkt. 166 at 14–15, *and* Dkt. 186 at 11, *with* Dkt. 166 at 16–18, *and* Dkt. 186 at 13–14.] But the Seventh Circuit teaches that assessing arguable probable cause is how the Court determines whether Defendants violated clearly established law, *see Mwangangi*, 48 F.4th at 825, so the Court addresses these arguments together.

as whether a police officer has "probable cause to believe a person possesses a firearm where (1) he pursues the person into a house and (2) immediately recovers a gun from the area where the person is detained?" [Dkt. 166 at 17; *accord id.* at 14–15 (arguing that arguable probable cause was present due to Stephenson's evasiveness combined with proximity to the gun).] But that view relies on Defendants' version of the facts, which the Court cannot assume to be true at summary judgment. [*See* Dkt. 177 at 18 (rejecting the factual premise for Defendants' assertion of immunity).] The Court realizes that Defendants did not have Stephenson's account before them when they filed their opening brief, but rather than accept Stephenson's version of events in their reply brief—as summary judgment requires—Defendants doubled down on their side of the story: "Stephenson did not cite a single case in which a court held that officers lacked probable cause where, as here, a gun was recovered near an occupant of a residence who had just fled from the police." [Dkt. 186 at 13; *accord id.* at 11 (repeating the evasiveness point).][19] At summary judgment the Court takes Stephenson's version of events as true: When the police arrived, he was inside the house, making a Polish in the kitchen, and he was detained in the kitchen, not in the living room area where the gun was recovered.

Assuming these facts are true, no reasonable officer could have believed there was probable cause to arrest Stephenson. It was clearly established as of July 4, 2017,

---

[19]     Defendants assert that Stephenson forfeited the issue of arguable probable cause by not responding to their argument that evasiveness plus proximity is sufficient. [Dkt. 186 at 11.] This is puzzling because Stephenson did address arguable probable cause, noting that the relevant facts are disputed, including regarding Stephenson's flight and proximity to the couch. [Dkt. 177 at 14–15.] Stephenson did not forfeit his response to this argument.

both under federal law and Illinois law, that "mere proximity to suspected criminal activity does not, without more, generate probable cause." *Richards*, 719 F.3d at 757; *see also, e.g.*, *United States v. Ingrao*, 897 F.2d 860, 863 (7th Cir. 1990) ("Clearly physical proximity to a suspected crime, without other indicia of … involvement, is insufficient to support a finding of probable cause." (citation omitted)); *People v. Carnivale*, 329 N.E.2d 193, 194 (Ill. 1975) (explaining that "mere presence in the same hotel lobby with the other two defendants whom the police suspected of gambling activities did not justify [a suspect's] arrest"); *People v. Lee*, 828 N.E.2d 237, 245 (Ill. 2005) ("[P]robable cause to arrest a particular individual does not arise merely from the existence of probable cause to arrest another person in the company of that individual." (citations omitted)).[20] On Stephenson's version of the evidence—no actual possession, no evasiveness, no flight, no direct proximity to the gun—the only fact linking Stephenson to the gun was that he was in the house where it was found, on the other side of the main living area. *See supra* at 8–11. No reasonable officer could have believed that an individual's mere presence on the other side of a house where a gun was found constitutes probable cause to arrest "in light of [the] well-established law" discussed here. *Mwangangi*, 48 F.4th at 825 (cleaned up).

Defendants argue that the Seventh Circuit's affirmance in relevant part of a grant of qualified immunity in *Taylor v. Hughes*, 26 F.4th 419 (7th Cir. 2022), supports their position here. [Dkt. 186 at 13–14.] In *Taylor*, an informant told a police

---

[20]    In fact, mere "presence in an area of expected criminal activity, standing alone, is not [even] enough to support a reasonable, particularized suspicion that the person is committing a crime," which is a lower standard of suspicion than probable cause. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citation omitted).

officer that when he visited Taylor's apartment, Taylor showed the informant a black .38-caliber revolver. 26 F.4th at 423. The police later searched Taylor's apartment, but they did not find the black revolver; instead, they found a blue semiautomatic pistol in a bedroom that was not Taylor's. *Id.* at 424–25. On Taylor's § 1983 false arrest claim, the district court granted qualified immunity, and the Seventh Circuit affirmed not based on the existence of probable cause, but rather "the broad language employed by some Illinois cases [about constructive possession] and the lack of a contrary case directly on point." *Id.* at 432–34 (surveying Illinois caselaw).

*Taylor* is helpful for Defendants, and it illustrates how far the protection of qualified immunity can extend. Even so, the Court finds that arguable probable cause is absent here on Stephenson's version of the facts. The evidence other than proximity linking Taylor to the gun was thin, but it was stronger than the evidence here. An informant linked Taylor to a gun, and a gun was found in Taylor's apartment, though not the same gun and not in his bedroom. *See id.* at 433–34. But here, Defendants lacked any plus factor in addition to proximity to the gun—no flight or evasiveness, and the gun was not found in the home in which Stephenson lived. Tellingly, in analogizing this case to *Taylor*, Defendants rely on facts that this Court cannot take as true at this stage: "If the defendants in *Taylor* were entitled to qualified immunity, then so too are Ortiz and Altenbach. Stephenson exhibited evasive behavior when he fled from the police, and he was physically present when the gun was recovered." [Dkt. 186 at 14.] Based on the disputes of fact, the Court cannot say that qualified immunity is appropriate at the summary judgment stage. *See Gant*, 924 F.3d at 448.

### 2.    Collective Knowledge Doctrine

Defendants also argue that Altenbach is entitled to qualified immunity because he reasonably relied on Ortiz's observations, which are imputed to him under the collective knowledge doctrine. [Dkt. 166 at 15–16; Dkt. 186 at 11–12.] But this doctrine applies only if probable cause (or, for qualified immunity, arguable probable cause) existed after pooling all officers' knowledge. *See Jump v. Village of Shorewood*, 42 F.4th 782, 789 (7th Cir. 2022) ("[Probable cause] exists at arrest when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspect committed an offense defined by state law." (citation omitted)). That is not the case here. Viewing the record in Stephenson's favor, Defendants "had no reason to be suspicious of [him] in the first place," which "forecloses almost any attempt they might make to show that they had arguable probable cause to arrest" him. *Jones v. Clark*, 630 F.3d 677, 684–85 (7th Cir. 2011) (analyzing whether arguable probable cause existed based on the officers' collective knowledge). The collective knowledge doctrine does not entitle Altenbach to qualified immunity because his knowledge plus Ortiz's does not add up to arguable probable cause.[21]

*    *    *

---

[21]    The Court does not reach the issue of whether Altenbach acted in objective good faith in relying on Ortiz's observations. [*See* Dkt. 166 at 16; Dkt. 186 at 12.] Although some district courts have described good faith as a requirement of the collective knowledge doctrine, recent Seventh Circuit caselaw has not, *e.g.*, *Jump*, 42 F.4th at 789, and older opinions more often discuss good faith reliance on an entity, not other individual officers, *see Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) (good faith reliance on own agency's knowledge); *United States v. Celio*, 945 F.2d 180, 183–84 (7th Cir. 1991) (good faith reliance on another agency's communication). *But see Hardiman v. Ford*, 1994 WL 585409, at *2–3 (7th Cir. Oct. 25, 1994) (nonprecedential) (good faith reliance on another officer). In any event, Defendants' collective knowledge is insufficient to create arguable probable cause, so the question of Altenbach's good faith is immaterial.

Factual disputes preclude granting qualified immunity to either Defendant, so the Court denies the motion for summary judgment on qualified immunity.

### C.    Other Claims

Having denied Defendants' motion for summary judgment on the wrongful detention claim on both the merits and qualified immunity, the Court must also deny summary judgment on the other claims. Defendants' arguments regarding the § 1983 conspiracy claim and the Illinois law malicious prosecution claim fail: since the substantive § 1983 claim survives, so does the conspiracy claim, and Defendants' only argument about malicious prosecution is that they had probable cause, but the Court rejected that argument above. [*See* Dkt. 166 at 18; Dkt. 186 at 13–14.] The claims against the City live on too, because the Court denied Ortiz and Altenbach's motion for summary judgment. [*See* Dkt. 166 at 5 n.2.]

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [Dkt. 162] is denied.

Enter: 21-cv-338
Date:  July 1, 2024

_____

Lindsay C. Jenkins
United States District Judge

26